COURT OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-361-CR

 

 

KHALED MOHAMMAD QADDURA                                          APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM COUNTY
COURT AT LAW NO. 2 OF PARKER COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury convicted Appellant Khaled Mohammad AKevin@ Qaddura
of  cruelty to an animal, and the trial
court sentenced him to 180 days=
confinement in the Parker County Jail and a fine of $4,000.  Appellant brings two points on appeal,
challenging the legal and factual sufficiency of the evidence to support his
guilt.  Because we hold that the evidence
is both legally and factually sufficient, we affirm the trial court=s
judgment.

Appellant was charged with the offense of cruelty
to animals by information on grounds that he had intentionally or knowingly
failed unreasonably to provide necessary food for one or more goats in his
custody, had intentionally or knowingly abandoned unreasonably the goat or
goats, and had intentionally or knowingly confined the goat or goats in a cruel
manner.[2]  Section 42.09 of the Texas Penal Code
provides in pertinent part that

(a) A person commits an
offense if the person intentionally or knowingly:

 

. . . .

 

(2) fails unreasonably to provide necessary food, care, or shelter for
an animal in the person=s custody;

 

(3) abandons unreasonably an animal in the person=s custody;

 

(4) transports or confines an animal in a cruel manner;

 

. . . .

 

(c) For purposes of this
section:

 

(1) AAbandon@ includes abandoning an
animal in the person=s custody without making
reasonable arrangements for assumption of custody by another person.

 








(2) AAnimal@ means a domesticated
living creature and wild living creature previously captured. AAnimal@ does not include an
uncaptured wild creature or a wild creature whose capture was accomplished by
conduct at issue under this section.

 

(3) ACruel manner@ includes a manner that
causes or permits unjustified or unwarranted pain or suffering.

 

(4) ACustody@ includes responsibility
for the health, safety, and welfare of an animal subject to the person=s care and control,
regardless of ownership of the animal.

 

(5) ANecessary food, care, or
shelter@ includes food, care, or
shelter provided to the extent required to maintain the animal in a state of
good health.[3]

 

Appellant operated Halal Slaughterhouse, a meat
processing plant in Weatherford, Texas. 
On July 20, 2004, Weatherford Police Officer Ronnie Corder was
dispatched to the slaughterhouse to investigate a complaint of a foul odor
coming from the property.  Corder
testified at trial that upon arriving at the property, he found multiple dead
sheep and goat carcasses in different stages of decomposition.  He observed a number of live animals, in his
estimation over fifty, most of which appeared underweight.  Several of the animals had secretions coming
from their noses and  eyes.  Some animals were lying on their sides and
could not get up.  Corder testified that
a few of the animals looked fairly healthy.








Corder further testified that he found limited
water for the animals; the property had three or four automatic watering
devices for the animals, but only one was hooked up to a water supply.  Most of the water troughs he observed had no
more than an inch of water in them.  One
water container appeared to be half full. 
The cows in one pen had no water at all.

Corder testified that he also looked for food for
the animals and found that none of the automatic feeders to which the animals
had access had any food in them.  There
were no leaves or foliage that the animals could get to.  Corder found hay in one area, but the hay
appeared to him to be dry, black, and moldy, and none of the animals had access
to it anyway.  Corder was unable to find
anyone else on the property except for a state inspector, so he left.

Corder returned three days later and found
Appellant working on the premises. 
Corder observed that the conditions on the property were the same as on
July 20.  Corder asked Appellant why he
had so many dead animals, and Appellant told him that he had bought underweight
and sick animals, including sheep and goats, from other slaughterhouses.  Corder advised Appellant that if Appellant
wanted to keep animals for longer than twenty-four hours, then he would have to
provide them with substantial food and water, and that sick animals kept longer
than twenty-four hours would have to be provided with medical care or be
euthanized.








Corder returned to the property once again on
July 28, 2004, eight days after his first visit and five days after his second
visit.  He spoke with Appellant and
Robert Kinney.  The animal carcasses had
been removed, but otherwise the conditions on the property appeared to be the
same as on his prior visits.  Corder
testified that he believed that Appellant would continue to make progress
toward compliance.

Corder returned to the property almost three
weeks later on August 16, 2004, again in response to a complaint of a foul
odor.  The animals appeared to be in the
same condition as on his previous visits, still with little to no water or
food, and again Corder observed dead and decomposing animals.  Appellant was not on the property, and Corder
observed a notice taped to the door and a substantial amount of mail in the
mailbox.  (The notice was not offered
into evidence, and the record does not reflect its content.)  Corder concluded that the property had been
abandoned and left to obtain a warrant to seize the animals based on the
offense of cruelty to animals.  He
returned the next day with other city officials and seized approximately
ninety-three animals.  Corder testified
that he saw no evidence that the animals had been fed since the previous
day.  Some of the animals had to be
carried to the trailer because they could not walk.








Kinney testified that Appellant had been on
vacation on both August 16 and August 17, 2004, and that Kinney had agreed to
feed and water the animals while Appellant was away in exchange for Appellant=s
allowing him to park his mobile home on the property.  Kinney further testified that he fed the
animals hay and gave them water every day, that the animals had plenty of hay
and water, and that one of the feeders had grain in it.








The evidence is uncontroverted that Appellant
made arrangements for his tenant, Kinney, to feed and water the animals while
he was gone a month or more.  The
evidence is also uncontroverted that the only thing Appellant left for Kinney
to feed the animals was moldy hay.  When
a grain delivery was attempted, no one was present to receive the grain, so the
truck driver left without delivering the grain. 
No grain was delivered after April. 
The evidence is also uncontroverted that the water troughs contained
little if any water.       Kinney claimed
that there was some grain in one of the feeders, but Corder testified to the
contrary.  Kinney never testified that he
fed the animals grain, and Corder testified that the only feed he saw on the
premises was the old moldy hay.  Corder
testified that on his last visit, the animals appeared to be in the same
condition as on his previous visits, still with little to no water or food, and
again Corder observed dead and decomposing animals.  The evidence also reflects that Corder had
warned Appellant at least twice that the animals were in danger and that he had
to take better care of them.  The
condition of the goats and other animals was as dismal when Appellant was
present as when he was absent.

Essentially, the trial was a swearing match
between the State=s witnesses and Appellant=s
witnesses. Unless the record clearly reveals that a different result is
appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@[4]  Thus, we must give due deference to the
fact-finder=s determinations, Aparticularly
those determinations concerning the weight and credibility of the evidence.@[5]








Additionally, although Appellant could argue that
the evidence does not reflect that his intent was to abuse, mistreat, and
starve the animals in his care, when Appellant left town, he left the animals,
including goats, in Kinney=s care,
but he left inadequate food to sustain the goats=
lives.  When Kinney called around August
16 to tell Appellant that the animals were dying, Appellant told him to give
the animals more hay, even though he was aware that the hay was old and
moldy.  No feed had been delivered since
April, yet Appellant did not instruct Kinney to order feed, and Appellant made
no effort to secure feed.  The animals,
including the goats, were enclosed in small spaces devoid of grass and foliage,
with little or no water, little or no grain, and no fresh hay. The record is
replete with photographs of dead or dying animals, little more than skeletons,
either in crowded pens or in larger enclosures with neither grass nor hay nor
feed and little or no water.  Thus, the
jury could reasonably have concluded that Appellant intentionally, or at least
knowingly, failed unreasonably to provide necessary food, care, or shelter for
an animal in his custody.[6]  Without objection, the jury returned a
general verdict rather than a separate verdict for each allegation submitted to
it.

 

 

 








Applying the appropriate standards of review,[7]
we hold that the evidence is both legally and factually sufficient to support
the jury=s
verdict.  We therefore overrule Appellant=s two
points and affirm the trial court=s
judgment.  

 

LEE
ANN DAUPHINOT

JUSTICE

PANEL A:   CAYCE, C.J.; LIVINGSTON and DAUPHINOT, JJ.

DO NOT PUBLISH

Tex.
R. App. P.
47.2(b)

 

DELIVERED:  March 1, 2007











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Penal Code Ann. ' 42.09
(Vernon Supp. 2006).





[3]Id.





[4]Johnson v. State, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000).





[5]Id. at 9.





[6]See Tex. Penal Code Ann. '
42.09(a)(2).





[7]See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton
v. State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005) (both providing legal
sufficiency standard of review); Watson v. State, 204 S.W.3d 404,
414-15, 417 (Tex. Crim. App. 2006); Drichas v. State, 175 S.W.3d 795,
799 (Tex. Crim. App. 2005); Sims v. State, 99 S.W.3d 600, 603 (Tex.
Crim. App. 2003); Johnson, 23 S.W.3d at 8-9, 11-12; Cain v. State,
958 S.W.2d 404, 407 (Tex. Crim. App. 1997) (all providing factual sufficiency
standard of review).